MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2015 ME 161
Docket:        Cum-14-216
Argued:        February 10, 2015
Decided:       December 15, 2015

Panel:         SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, and HJELM, JJ.

KAREN CORMIER

v.

GENESIS HEALTHCARE LLC, et al.

HJELM, J.

[¶1]  In January 2012, Karen Cormier was discharged from employment as a certified nursing assistant (CNA) at a nursing home owned by Genesis Healthcare LLC.  She commenced this action in the Superior Court (Cumberland County), alleging that she was terminated because she had made complaints about staffing and patient safety, and that Genesis thereby violated the Maine Whistleblowers' Protection Act (WPA), 26 M.R.S. §§ 831-840 (2014).  The court (*Warren, J.*) granted Genesis's motion for summary judgment, concluding that although Cormier presented evidence that her complaints constituted protected activity, she failed to produce evidence of a causal relationship between the complaints and her termination.  Cormier appealed, and Genesis cross-appealed.  We conclude that the trial court correctly determined that the evidence is sufficient to allow a reasonable jury to find that Cormier's complaints were protected under the WPA.  We also

conclude, however, that the record on summary judgment could reasonably support a finding that the adverse employment action was substantially motivated at least in part by retaliatory intent. We therefore vacate the judgment and remand for further proceedings.

## I. BACKGROUND

[¶2] The summary judgment record contains the following evidence as viewed in the light most favorable to Cormier, who is the non-moving party. *See Angell v. Hallee*, 2014 ME 72, ¶ 16, 92 A.3d 1154. Genesis is the parent company of Scarborough Operations, LLC, which owns Pine Point Center, a nursing home in Scarborough.[1] Cormier is a CNA who began working at Pine Point Center in 2002. Beginning in 2009, Genesis reduced staffing levels on Cormier's shift so that there were usually three or four CNAs working in her unit, rather than four or five. This meant that CNAs were sometimes unable to get to the residents promptly when they rang their call bells, causing delays both in helping residents use the bathroom and in transferring residents from their beds to chairs or wheelchairs. Cormier believed that these delays put residents at a higher risk for falls because they would try to get out of bed by themselves.

---

[1] Although Genesis disputes whether it, rather than Scarborough Operations, was Cormier's employer, it acknowledges for the purpose of summary judgment that there is a dispute of material fact regarding whether Genesis and Scarborough Operations are a single enterprise for the purposes of Cormier's claim.

[¶3]  In the spring of 2011, Cormier spoke to Michelle Dewitt, the Director of Nursing, regarding her concerns about the staffing levels, stating that she was worried that CNAs would not be able to promptly respond to call bells.  Cormier also told a charge nurse "quite a few times" throughout 2011 that residents were upset that call bells were not being answered promptly, and she told two other charge nurses that she was frustrated trying to help all of the residents at the reduced staffing level.  In particular, she reported to one charge nurse that she "was concerned about the safety of the residents if I was not able to get to them on time."  Finally, on December 28, 2011, after the facility lost power when only three CNAs were working in Cormier's unit, Cormier complained to the nurse educator that there were not enough CNAs to help the residents get up for dinner while also dealing with the power outage.

[¶4]  On December 31, 2011, soon after Cormier's most recent complaint, Cormier was approached by Michelle Dewitt because a charge nurse had overheard another CNA talking about Cormier hitting a resident on the hand while caring for her.  After meeting with Dewitt, Cormier signed a statement reporting that on December 28, 2011, a resident became combative and that she tried to hold the resident's hand so that the resident could not hit her.  Cormier was then informed that she was being suspended pending an investigation into the incident.  Later,

4

Cormier realized that she had not been assigned to that resident's wing on December 28 and called Dewitt to tell her that her statement was incorrect.

[¶5] Dewitt interviewed the CNA who had witnessed the incident, the resident's roommate, and the charge nurse who had overheard the discussion about the incident. Leslie Currier, the Pine Point Center Administrator, then reviewed Dewitt's investigative material and Cormier's personnel file. Following that review, Currier contacted Mary Norton, Genesis's Regional Human Resources Manager, to consult with her about the possibility of terminating Cormier. Norton supported Currier's conclusion that Cormier should be terminated, and on January 4, 2012, Dewitt and Currier met with Cormier. After Cormier reiterated that she was not working in the resident's wing on the day of the alleged incident, Currier informed her that she was being terminated due to that incident.

[¶6] In December 2012, Cormier filed a complaint in Superior Court alleging that her termination constituted retaliation in violation of the WPA. *See* 26 M.R.S. § 833. She alleged that her complaints about understaffing constituted protected activity pursuant to the WPA and that she was terminated in retaliation for making the complaints. Genesis moved for summary judgment, arguing both that Cormier's complaints were not protected activity and that her complaints were not causally related to her termination. The court concluded that there was a dispute of material fact as to whether Cormier's complaints were

protected activity pursuant to the WPA, but it issued a summary judgment in favor of Genesis on the ground that Cormier had not "demonstrated that there is a triable issue of fact as to the existence of a causal connection between the staffing complaints she made and defendants' decision to terminate her after the alleged slapping incident." Cormier appealed, and Genesis cross-appealed.

## II. DISCUSSION

[¶7] "We review the grant of a motion for summary judgment de novo," viewing the evidence "in the light most favorable to the party against whom the summary judgment has been granted in order to determine if there is a genuine issue of material fact." *Budge v. Town of Millinocket*, 2012 ME 122, ¶ 12, 55 A.3d 484 (quotation marks omitted). "A genuine issue of material fact exists when the factfinder must choose between competing versions of the truth." *Dyer v. Dept. of Transp.*, 2008 ME 106, ¶ 14, 951 A.2d 821 (quotation marks omitted). When the party moving for summary judgment is the defendant, "the burden rests on that party to show that the evidence fails to establish a prima facie case" for the claim. *Budge*, 2012 ME 122, ¶ 12, 55 A.3d 484.

[¶8] A claim for violation of rights established under the Maine WPA consists of three elements: (1) that the employee engaged in activity protected by the WPA; (2) that the employer imposed adverse employment action against the employee; and (3) that there was a causal connection between the protected

6

activity and the adverse employment action. *See, e.g., Fuhrmann v. Staples the Office Superstore East, Inc.*, 2012 ME 135, ¶ 15, 58 A.3d 1083; *Walsh v. Town of Millinocket*, 2011 ME 99, ¶ 24, 28 A.3d 610. There is no dispute that Cormier was the subject of an adverse employment action when she was terminated. We therefore are left with the question of whether the record on summary judgment is sufficient to generate triable claims that Cormier engaged in protected activity and that the adverse employment action was motivated at least in part by any such activity—in other words, whether Cormier has presented a prima facie case of all elements of her WPA claim. *See Brady v. Cumberland Cty.*, 2015 ME 143, ¶ 14, --- A.3d ---.[2] We consider those contested issues separately.

A. Protected Activity

[¶9] First, in its cross-appeal, Genesis argues that the court erroneously determined that on this record, a jury could reasonably find that Cormier's complaints about the staffing levels at Genesis rose to the level of protected activity.

---

[2] In our recent decision in *Brady v. Cumberland County*, we held that the summary judgment framework in WPA claims consists of a unitary examination that in part analyzes whether the employee has presented evidence of each of the three elements of the claim, thereby dispensing with the burden-shifting framework found in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973), that we previously applied in these cases. 2015 ME 143, ¶ 39, --- A.3d ---. Under the approach prescribed in *Brady*, the employee must still generate a prima facie case in support of a WPA claim challenged in a summary judgment motion, *id.*, but the term "prima facie" merely describes the evidence that "is sufficient to withstand a motion for summary judgment" generally, rather than a specialized categorization of evidence that does not directly track the three elements of the claim, *id.* ¶ 28.

[¶10] The Legislature has defined the categories of employee conduct that are protected under the WPA. Here, the court concluded that, of those categories, Cormier generated a triable claim that her complaints about staffing levels satisfied the following statutory definition of protected activity:

> The employee, acting in good faith, or a person acting on behalf of the employee, reports to the employer or a public body, orally or in writing, what the employee has reasonable cause to believe is a condition or practice that would put at risk the health or safety of that employee or any other individual.

26 M.R.S. § 833(1)(B).

[¶11] Although this provision is not triggered by every complaint that relates to safety, it protects employees who, in good faith, make safety-related complaints when the employee reasonably believes that a dangerous condition or practice exists. *Stewart-Dore v. Webber Hosp. Ass'n*, 2011 ME 26, ¶ 11, 13 A.3d 773. A complaint is made in good faith if the employee's motivation is to stop a dangerous condition. *Id.* A complaint is supported by reasonable cause when the employee has a subjective and objectively reasonable belief that a dangerous condition or practice exists. *Id.*

[¶12] Cormier presented evidence that she complained a number of times about understaffing at Genesis and the dangerous effect of those staffing practices on residents. She also presented evidence that some residents were harmed or exposed to harm by slow response time resulting from inadequate staffing levels.

8

This evidence is sufficient to support a finding that Cormier held a reasonable belief that staffing levels compromised the safety of the residents and that her complaints would bring the safety issue to Genesis's attention.

[¶13]   Genesis argues that because staffing levels are subject to state regulation, the question of whether her complaints are protected under the WPA is determined, not by reference to section 833(1)(B), which relates to safety complaints generally, but rather by reference to section 833(1)(E), which applies more particularly to complaints about violations of "standards of care." Section 833(1)(E) provides whistleblower protection when

> [t]he employee, acting in good faith and consistent with state and federal privacy laws, reports to the employer, to the patient involved or to the appropriate licensing, regulating or credentialing authority, orally or in writing, what the employee has reasonable cause to believe is an act or omission that constitutes a deviation from the applicable *standard of care* for a patient by an employer charged with the care of that patient.

(Emphasis added.)

[¶14]   Here, standards of care governing staffing levels at the Pine Point Center were established by agency rules promulgated by the Maine Department of Health and Human Services (DHHS).  *See* 13 C.M.R. 10 144 110-20 to -21 § 9.A (2001).   Genesis argues that because complaints about staffing levels are complaints about fulfillment of a regulatory standard of care, the question of whether those complaints are protected is determined by reference to section

833(1)(E). There is no evidence that Cormier complained that staffing levels fell below specific regulatory minimums. Because of this, Genesis contends that her complaints did not sufficiently invoke the protections created by section 833(1)(E), and further, that she may not reframe those complaints as ones based more generally on resident safety pursuant to section 833(1)(B).

[¶15] Genesis's argument is not persuasive because the Legislature has framed sections 833(1)(B) and (E) in the disjunctive, thereby allowing an employee to satisfy either of the sections in order to be protected under the WPA. By their own terms, sections 833(1)(B) and (E) are not mutually exclusive, and if an employee's complaint falls within the parameters of either one, it is statutorily protected. Therefore, an employee is not required to cast a complaint in terms of applicable legal criteria that define a specific standard of care applicable to section 833(1)(E) if the complaint falls within any of the other categories of protected activity enumerated in the WPA. Here, because the evidence would allow a reasonable jury to find that Cormier's complaints were protected pursuant to section 833(1)(B), she has met her burden of production on the issue of protected activity, irrespective of whether her complaints are also protected pursuant to section 833(1)(E).

[¶16] The court therefore did not err in determining that a fact-finder could reasonably find that Cormier's complaints constituted protected activity. We next

consider the question of whether Cormier produced evidence from which a jury could reasonably find that her termination from employment was causally related to her protected activity.

B.    Causation

[¶17]    In granting Genesis's motion for summary judgment, the court determined that Cormier had not produced evidence of a causal relationship between any protected activity and her termination.    Cormier argues that this constituted error.    To meet the burden of production on the causation element, the employee must present direct or circumstantial evidence that retaliation arising from the protected activity "was a substantial, even though perhaps not the only, factor motivating the employee's dismissal."    *Walsh*, 2011 ME 99, ¶ 25, 28 A.3d 610 (quotation marks omitted); *see also Fuhrmann*, 2012 ME 135, ¶ 21, 58 A.3d 1083.  We examine this issue bearing in mind that the question of whether an employee has generated a dispute of material fact regarding an employer's motivation or intent is "often difficult to assess at the summary judgment stage." *Fuhrmann*, 2012 ME 135, ¶ 13, 58 A.3d 1083 (quotation marks omitted).

[¶18]    In the context of this case, the central question is whether the summary judgment record contains evidence that would allow a jury to reasonably find that Leslie Currier, when she participated in the decision to terminate

Cormier's employment, knew about Cormier's complaints.[3]  Here, attribution of knowledge to a decision-maker is necessary, because "one cannot have been motivated to retaliate by something [s]he was unaware of." *Medina-Rivera v. MVM, Inc.*, 713 F.3d 132, 139 (1st Cir. 2013) (applying federal employment discrimination law).[4]  A plaintiff may prove a WPA retaliation claim through either direct or circumstantial evidence, *see Fuhrmann*, 2012 ME 135, ¶ 16, 58 A.3d 1083, and so we look to both types of evidence to determine if Cormier has presented evidence of causation as part of her prima facie case.

[¶19]  The record does not contain any direct evidence that Currier knew that Cormier had made complaints about staffing levels.  At her deposition, Cormier admitted that she never complained directly to Currier,[5] and Currier herself testified that she was unaware of the complaints.  There is also no direct

---

[3]  On appeal, Cormier does not contend that the other person involved in the termination decision, Mary Norton, knew of her complaints.

[4]  We have recognized that in some circumstances, under the "cat's-paw" theory of liability, an employee may present evidence of causation when the decision-maker is unaware of the protected activity.  This, however, requires evidence that an agent of the employer with a retaliatory motive intentionally influenced another agent, who is unaware of the protected activity, to take adverse employment action against the employee.  The improper motive is thereby imputed to the decision-maker as evidence of a causal connection between the protected activity and the adverse action.  *See Walsh v. Town of Millinocket*, 2011 ME 99, ¶ 22, 28 A.3d 610.  Cormier does not invoke the "cat's-paw" theory here, thereby requiring her to prove that Currier had knowledge of the complaints.

[5]  Cormier contends that direct evidence of Currier's knowledge may be found in one of her interrogatory answers in which she states that she complained directly to Currier.  That statement, however, is directly contradicted by her sworn testimony that she had never talked to Currier about staffing.  As the trial court correctly observed, she cannot create a dispute of fact simply by contradicting her own sworn statement.  *See Zip Lube, Inc. v. Coastal Sav. Bank*, 1998 ME 81, ¶ 10, 709 A.2d 733.

12

evidence that a third party told Currier that Cormier had made complaints about the adequacy of staffing.

[¶20] Despite the absence of direct evidence, the record on summary judgment contains evidence that would allow a jury to reasonably draw an inference that Currier knew of Cormier's complaints about understaffing. That inference could reasonably arise from the combined effect of evidence (1) that due to the nature of Cormier's complaints they could or should have been reported to Currier, and (2) that Cormier was terminated shortly after her last complaint.

[¶21] First, there is evidence from which a jury could find that as part of her supervisory responsibilities, Currier was particularly attentive to staffing levels at Pine Point Center and complaints about that issue. In July 2011, for example, after a nurse resigned from Genesis due to concerns about staffing, Currier issued an internal memorandum to Pine Point Center staff about staffing standards and policies to ensure regulatory compliance. Additionally, Pine Point Center had a policy requiring that problems with adequacy of staffing be reported to a supervisor, including Currier if her subordinates were unavailable. Finally, Currier had issued a directive that if a supervisor or manager discovered or even suspected that staffing levels fell below regulatory requirements, she was to be notified of the issue "regardless of whether [she was] on duty." There is evidence that Cormier made complaints to members of Pine Point Center's staff, including supervisory

personnel, between the spring of 2011 and December 28, 2011. Based on this evidence, a jury could reasonably infer that a staff member's repeated complaints about staffing levels would follow a communication pathway that Pine Point Center and Currier herself had created for this issue, and that Cormier's repeated complaints would have been communicated to Currier. *See Brady*, 2015 ME 143, ¶ 21, --- A.3d ---.

[¶22]   Second, "[t]emporal proximity of an employer's awareness of protected activity and the alleged retaliatory action may serve as the causal link for purposes of a prima facie case." *Daniels v. Narraguagus Bay Health Care Facility*, 2012 ME 80, ¶ 21, 45 A.3d 722; *see also Noviello v. City of Boston*, 398 F.3d 76, 86 (1st Cir. 2005) (applying both federal and state employment discrimination law and reasoning that an adverse condition of employment that "follows hard on the heels of protected activity . . . often is strongly suggestive of retaliation"); *Oliver v. Dig. Equip. Corp.*, 846 F.2d 103, 110 (1st Cir. 1988) (interpreting federal employment discrimination law and stating that evidence that adverse employment action occurred "soon after" the employee's known protected activity is circumstantial proof of a causal connection "because it is strongly suggestive of retaliation"). Here, there is evidence that Cormier first complained about staffing issues in the spring of 2011 and that her last complaint was on December 28, 2011. Three days later, Currier suspended Cormier, and on

January 4, terminated her. Particularly when combined with evidence that the complaints could have been relayed to Currier, the close temporal proximity among these events could be a sufficient basis for a jury to find that Cormier's complaints were at least in part a substantial motivation for Currier's decision to terminate her from employment. *See Araya-Ramirez v. Office of the Courts Admin.*, No. 14-1619, 2015 U.S. Dist. LEXIS 115661, at *26-27 (D. P.R. August 31, 2015) (holding that two months between protected activity and adverse employment action is sufficient to support an inference of causation pursuant to the federal whistleblower protection statute); *Joyce v. The Upper Crust, LLC*, No. 10-12204-DJC, 2015 U.S. Dist. LEXIS 95542, at *14 (D. Mass. July 21, 2015) (addressing a retaliation claim under federal law and holding that a span of "months" between protected activity and adverse employment action, culminating in termination after six months, when combined with other evidence, is sufficient to support an inference of causation); *Harding v. Cianbro Corp.*, 498 F. Supp. 2d 344, 350 (D. Me. 2007) (citing cases and concluding that a five-week interval is sufficient to support an inference of causation pursuant to federal and state disability discrimination law); *Madeja v. MPB Corp.*, 821 A.2d 1034, 1046-47 (N.H. 2003) (analyzing federal employment discrimination law and holding that an eight-day period between protected activity and adverse employment action is sufficient to support an inference of causation).

[¶23]  For these reasons, although the issue is in dispute, the record on summary judgment could allow a reasonable jury to find that Currier had acquired knowledge of Cormier's complaints regarding the adequacy of staffing levels at the Pine Point Center facility and that those complaints constituted at least one substantial factor that motivated Currier to terminate Cormier from employment.

## III.  CONCLUSION

[¶24]  We therefore conclude that the record on summary judgment is sufficient to allow a jury to reasonably find that Cormier's complaints constituted a protected activity under the WPA and that Genesis's decision to terminate her from employment was substantially motivated at least in part by those complaints. Accordingly, Cormier has presented a prima facie case of unlawful retaliation, and we must vacate the summary judgment entered in favor of Genesis.

The entry is:

> Judgment vacated.  Remanded for further proceedings consistent with this opinion.

**On the briefs:**

Guy D. Loranger, Esq., Law Office of Guy D. Loranger, P.A., Old Orchard Beach, for appellant Karen Cormier

James R. Erwin, Esq., and Michelle Y. Bush, Esq., Pierce Atwood LLP, Portland, for cross-appellants Genesis HealthCare LLC and Scarborough Operations LLC

**At oral argument:**

Guy D. Loranger, Esq., for appellant Karen Cormier

James R. Erwin, Esq., for cross-appellants Genesis HealthCare LLC and Scarborough Operations LLC

Cumberland County Superior Court docket number CV-2012-533
FOR CLERK REFERENCE ONLY