MAINE SUPREME JUDICIAL COURT                          Reporter of Decisions
Decision:    2020 ME 23
Docket:      Ken-19-201
Argued:      December 4, 2019
Decided:     January 30, 2020

Panel:       SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, and HUMPHREY, JJ.
Majority:    SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, and HUMPHREY, JJ.
Dissent:     JABAR, J.

ROLAND PUSHARD III

v.

RIVERVIEW PSYCHIATRIC CENTER

ALEXANDER, J.

[¶1]  Roland Pushard III appeals from a summary judgment entered by the Superior Court (Kennebec County, *Stokes, J.*) in favor of Riverview Psychiatric Center on Pushard's complaint alleging a violation of the Whistleblowers' Protection Act, 26 M.R.S. §§ 831-840 (2018).  Pushard argues that there are genuine issues of material fact regarding whether he is entitled to whistleblower protection based on complaints he made, while employed at Riverview, about (1) Riverview's staffing policies; (2) his supervisor's alleged mistreatment of another employee; and (3) a potential violation of patient

2

confidentiality pursuant to the Health Insurance Portability and Accountability Act (HIPAA), *see* 45 C.F.R. §§ 164.500-.534 (2019). We affirm the judgment.[1]

## I. CASE HISTORY

[¶2] Viewed in the light most favorable to Pushard, as the party against whom summary judgment has been granted, the following material facts are undisputed. *See Berry v. Mainestream Finance*, 2019 ME 27, ¶ 6, 202 A.3d 1195.

[¶3] Pushard was the director of nursing at Riverview. His supervisor was Jay Harper, the superintendent of Riverview. As director of nursing, Pushard often disagreed with Harper's staffing decisions and policies. The parties agree that "[u]nderstaffing was a persistent, ongoing problem at Riverview for years." The issue was publicly known and had been discussed by the media and the Legislature.

[¶4] To address Riverview's staffing problems, Harper instituted several new policies, including replacing mental health workers with acuity specialists.[2] Pushard disagreed with this decision and told Harper that he

---

[1] To the extent that Pushard raises arguments not discussed in this opinion, we are unpersuaded.

[2] The statement of material facts does not explain with any detail the difference between a mental health worker and an acuity specialist. The statement of material facts says only that Pushard "felt tha[t] non-CNAs could not provide the range of hands-on care to patients that CNAs could." "As a central tenet of summary judgment motion practice, '[f]acts not set forth in the statement of material facts are not in the summary judgment record, even if the fact in question can be gleaned from affidavits or other documents attached to, and even referred to in portions of, a statement of material

believed the decision threatened the safety of patients and employees because acuity specialists could not perform all the tasks that mental health workers could.

[¶5] Harper also moved two full-time nurse educators to administrative roles. Although Harper allowed Pushard to hire two new employees to fill the vacant positions, Pushard eventually hired two part-time nurse educators because no one who applied for the positions was willing to work full-time. Pushard told Harper that he disagreed with Harper's decision to move the full-time nurse educators because he believed that replacing them with part-time employees would result in nurse educators spending less time assisting with patient management, which in turn would create unsafe conditions for patients and employees.

[¶6] The record demonstrates that Pushard "did not believe that he was making Harper or anyone else [at Riverview] aware of anything they were not already aware of" when he made complaints about Harper's decisions to hire acuity specialists and to move the full-time nurse educators to administrative roles.

---

fact.'" *Berry v. Mainestream Finance*, 2019 ME 27, ¶ 7, 202 A.3d 1195 (alteration in original) (quoting *HSBC Bank USA, N.A. v. Gabay*, 2011 ME 101, ¶ 22, 28 A.3d 1158).

4

[¶7] The assistant director of nursing lodged complaints similar to those made by Pushard. Around the time that Pushard and the assistant director made these complaints, Harper took away the assistant director's office and assigned it to another employee. Pushard also perceived that Harper had treated the assistant director in a disrespectful manner during meetings. Pushard complained to Harper, explaining that he thought Harper was retaliating against the assistant director because of her complaints about Harper's staffing decisions.

[¶8] In early 2015, Pushard reported to Harper that a Riverview employee had sent internal hospital documents to a former employee. Pushard was concerned that the documents contained patient information and that the release of the information violated HIPAA. Harper reviewed the documents that were sent to the former employee and referred the matter to Riverview's risk management office. The risk management office did not advise Harper that a HIPAA violation had occurred.

[¶9] In December 2014, a nurse under Pushard's supervision sent Pushard an email detailing her concerns about another nurse, referred to in the record as "Nurse A." By April 2015, several employees had reported that Nurse A was having difficulty performing her duties because of tiredness or

impairment and that Nurse A was diverting patient medication. At least three nurses made these allegations directly to Pushard. Pushard discounted the reports because he believed they originated from an employee who did not like Nurse A. Nevertheless, Pushard instructed the assistant director to investigate. The assistant director did not find evidence that Nurse A had diverted medication. Pushard never made Harper or the Riverview human resources staff aware of the allegations against Nurse A.

[¶10] Another employee eventually reported Nurse A directly to the human resources staff. This report led to an investigation of Nurse A, who was terminated after Riverview substantiated allegations that she had been sleepy and inattentive on duty and that she had been overstaying her scheduled breaks because she would use that time to sleep in her car. Pushard was placed on administrative leave pending an investigation into whether he knew of the concerns about Nurse A and whether he acted improperly by failing to relay those concerns to Harper or to human resources.

[¶11] After completing its investigation of Pushard's conduct, Riverview's Human Resources Department concluded the following in a written report:

> Although he took some action, Mr. Pushard did not report these matters to management above him, follow up on the action he had

6

taken in January 2015, or more closely monitor the on-going situation involving Nurse A to ensure that the issues were being appropriately addressed. Mr. Pushard asserted that he knew Nurse A was sickly, for which he made adjustments to her job in January 2015 and May 2015, but did not know there were concerns she was impaired by drugs at work. However, he didn't follow up on these adjustments or any other concerns after January 2015 nor did he have other nursing managers actively monitor the situation.

[¶12] Ricker Hamilton, the deputy director of DHHS, reviewed this report and informed Pushard that he was recommending Pushard's termination. At a *Loudermill* hearing, Pushard's termination was upheld. *See Cleveland Bd. of Education v. Loudermill*, 470 U.S. 532 (1985) (holding that certain public sector employees have a due process right to a hearing before their employment is terminated).

[¶13] Pushard filed a complaint with the Maine Human Rights Commission and received notice of his right to sue. *See* 5 M.R.S. § 4612(6) (2018). Pushard then filed the instant action. The court granted Riverview's motion for summary judgment, and Pushard timely appealed. *See* M.R. App. P. 2B(c)(1).

## II. LEGAL ANALYSIS

[¶14] We review de novo the grant of a motion for summary judgment. *See Brady v. Cumberland County*, 2015 ME 143, ¶ 10, 126 A.3d 1145. Summary judgment is proper if the moving party is entitled to judgment as a matter of

law because, considering the evidence "in the light most favorable to the party against whom the summary judgment has been granted," there is no "genuine issue of material fact" for a jury to decide. *Id.*

[¶15] A WPA claim consists of three elements: "(1) [the employee] engaged in activity protected by the WPA; (2) [the employee] experienced an adverse employment action; and (3) a causal connection existed between the protected activity and the adverse employment action." *Id.* ¶ 14; *see* 26 M.R.S. § 833(1). "If the evidence in the summary judgment record would allow a jury to find for the employee on each element of the employee's case, then the employer is not entitled to summary judgment." *Brady*, 2015 ME 143, ¶ 39, 126 A.3d 1145.

[¶16] Pushard asserts that he engaged in three protected activities that entitled him to whistleblower protection from adverse employment actions: (1) complaining about Harper's staffing decisions; (2) complaining about Harper's treatment of the assistant director; and (3) reporting a possible HIPAA violation. Only the first and third of these claims merit a full discussion.[3]

---

[3] Pushard's argument that he engaged in protected activity when he complained to Harper about Harper's mistreatment of the assistant director of Nursing contends that (1) the assistant director engaged in protected activity when she complained about Harper's staffing decisions; (2) Harper violated the WPA when he retaliated against the assistant director by taking away her private office space and treating her discourteously in meetings; and (3) Pushard's complaint about Harper's conduct was a whistleblower report of his employer's violation of law pursuant to 26 M.R.S.

8

## A.  Complaints About Staffing

[¶17]  As relevant to Pushard's claim, the WPA applies where

> [t]he employee, acting in good faith, or a person acting on behalf of the employee, reports to the employer or a public body, orally or in writing, what the employee has reasonable cause to believe is a condition or practice that would put at risk the health or safety of that employee or any other individual.

26 M.R.S. § 833(1)(B).  In *Cormier v. Genesis Healthcare LLC*, 2015 ME 161, ¶ 11, 129 A.3d 944, we explained that "[a]lthough this provision is not triggered by every complaint that relates to safety, it protects employees who, in good faith, make safety-related complaints when the employee reasonably believes that a dangerous condition or practice exists."  To satisfy the reasonable cause requirement, an employee must show that he has both "a subjective and objectively reasonable belief that a dangerous condition or practice exists."  *Id.*; *see Stewart-Dore v. Webber Hosp. Ass'n*, 2011 ME 26, ¶ 11, 13 A.3d 773.

---

§ 833(1)(A) (2018) (making it unlawful for an employer to take an adverse employment action against an employee who reports a violation of the law).

We find no merit to Pushard's contention.  As we will explain, *see infra* ¶¶ 17-22, neither Pushard's nor the assistant director's complaints about understaffing qualify as protected activity.  Even if Pushard subjectively believed that he was reporting a violation of the WPA when he complained about Harper's mistreatment of the assistant director, this is not enough to bring him within the WPA's scope. *See Galouch v. Dep't of Prof'l & Fin. Reg.*, 2015 ME 44, ¶¶ 13-15, 114 A.3d 988 (explaining that a "subjective belief alone is insufficient to meet the WPA's reasonable cause requirement").

[¶18] Pushard argues that he made whistleblower protected complaints when he told Harper that replacing mental health workers with acuity specialists[4] and replacing two full-time nurse educators with two-part time nurse educators compromised patient and employee safety.

[¶19] Pushard's staffing complaints were not whistleblower protected activity because he was not exposing a concealed or unknown safety issue. Instead, he was simply giving his opinion concerning his supervisor's attempts to address well-known problems related to staffing. In *Cormier*, 2015 ME 161, ¶ 12, 129 A.3d 944, we explained that an employee had presented evidence sufficient to survive a motion for summary judgment because she had shown facts "sufficient to support a finding that [she] held a reasonable belief that staffing levels compromised the safety of the residents *and that her complaints would bring the safety issue to [her employer's] attention*."  (Emphasis added.)

[¶20] Similarly, the First Circuit has explained that the WPA applies only if an employee's "report was made *to shed light on and 'in opposition to'*" an illegal act or unsafe condition. *Harrison v. Granite Bay Care, Inc.*, 811 F.3d 36,

---

[4] Pushard argued in his brief and at oral argument that acuity specialists are harder to recruit than are mental health workers and that the resultant delay in hiring contributed to unsafe conditions caused by understaffing.  However, there is no support in the statement of material facts for this proposition.  We must therefore disregard Pushard's assertion. *See Berry*, 2019 ME 27, ¶ 7, 202 A.3d 1195.

51 (1st Cir. 2016) (emphasis added). *Cormier* and *Harrison* thus support the proposition that an employee does not enjoy whistleblower protection simply because he disagrees with his employer about whether the employer's policy decisions cause safety concerns. Instead, a "report" under the WPA is one that "would bring the safety issue to the [the employer's] attention," *Cormier*, 2015 ME 161, ¶ 12, 129 A.3d 944, or is "made to shed light on and 'in opposition to'" a safety-related concern. *Harrison*, 811 F.3d at 51.

[¶21] Pushard's conduct does not meet that standard because he was simply engaged in a policy dispute with his employer about how best to handle Riverview's staffing issues. That Riverview was understaffed was known to the public, the Legislature, and Riverview employees. Even if the specific staffing decisions about which Pushard complained were not widely known, it is uncontroverted that Pushard "did not believe that he was making Harper or anyone else aware of anything they were not already aware of." For this reason, Pushard was not *reporting*; he was complaining.

[¶22] Because Pushard's complaints about Harper's staffing decisions fall well short of being "reports" as that term is used in the WPA, we have no occasion here to articulate a comprehensive standard for what qualifies as a protected report. In particular, we decline to adopt an "initial reporter" rule for

WPA cases, as urged by Riverview.[5]   Under the particular facts of this case, summary judgment was proper because there is no genuine issue of material fact as to whether Pushard intended, at the time he made his complaints, to expose an unknown or concealed safety issue.  *See Cormier*, 2015 ME 161, ¶ 12, 129 A.3d 944; *Harrison*, 811 F.3d at 48-51.

B.    HIPAA Violation

[¶23]   Pushard also challenges the court's determinations that (1) his report of a possible HIPAA violation was not protected activity and (2) even if it was protected, summary judgment was also warranted on the causation element of Pushard's claim.  Assuming, without deciding, that the report of a potential HIPAA violation was protected activity, Pushard has not established any genuine dispute as to material fact regarding causation.

[¶24]   An employee satisfies the causation element of a WPA claim by showing that his protected activity "was a substantial, even though perhaps not the only, factor motivating the employee's dismissal."  *Walsh v. Town of Millinocket*, 2011 ME 99, ¶ 25, 28 A.3d 610.  The appropriate inquiry is

---

[5]  In *Currie v. Indus. Sec., Inc.*, 2007 ME 12, ¶ 26 & n.7, 915 A.2d 400, we noted, without resolving, the argument that an employee cannot maintain a WPA claim if that employee is not the "initial reporter," that is, if the employer has already learned of the unsafe condition or practice from some other source.

"whether the record as a whole would allow a jury to reasonably conclude that the adverse employment action was motivated at least in part by retaliatory intent." *Brady*, 2015 ME 143, ¶ 37, 126 A.3d 1145.

[¶25]   Pushard argues that (1) the temporal proximity between his report of a HIPAA violation and his suspension and termination suffices to survive a summary judgment motion on the issue of causation and (2) Riverview should have concluded that he did nothing wrong in his handling of the reports about Nurse A, and therefore the reason given by Riverview for his termination was pretextual.

[¶26]   Pushard's pretext argument misses the mark.   In *Murray v. Kindred Nursing Ctrs. West LLC*, 789 F.3d 20, 27 (1st Cir. 2015), the First Circuit explained—and we agree—that "evidence of a decisionmaker's mistaken judgment is not dispositive of the question of pretext unless that evidence would permit the factfinder to conclude that the stated nondiscriminatory justification for the adverse employment action was either knowingly false or made in bad faith."   *See also Johnson v. York Hospital*, 2019 ME 176, ¶ 25, --- A.3d ---.   Pushard does not argue that Hamilton knew that the human resources report contained false information, that Hamilton relied on the report in bad faith, or that those who created the report were biased against

Pushard because of his report of a HIPAA violation. Moreover, Pushard has not offered any evidence that would allow a factfinder to reasonably conclude that Harper, Hamilton, or anyone else at Riverview wanted to manufacture a reason for Pushard's termination because of his report of a potential HIPAA violation. For this reason, Pushard's pretext argument falls short.

[¶27] Therefore, to survive the summary judgment motion as to causation, Pushard must rely solely on the temporal proximity between his report of a HIPAA violation and his termination. In *Theriault v. Genesis Healthcare LLC*, 890 F.3d 342, 352 (1st Cir. 2018), the First Circuit rejected a similar argument, explaining that temporal proximity "is not sufficient, by itself, to forge a causal link strong enough to create an inference of causation and thus satisfy [the standard set forth in *Brady*] in the face of an employer's asserted legitimate non-retaliatory reason for the adverse employment action." We similarly conclude that, in light of Riverview's asserted non-retaliatory justification for its termination decision—specifically, Pushard's mishandling of the reports about Nurse A—Pushard has failed to demonstrate the existence of a triable issue of fact as to the element of causation.

The entry is:

Judgment affirmed.

14

---

JABAR, J., dissenting.

[¶28]  I respectfully dissent because I believe there are genuine issues of material fact regarding whether Pushard engaged in protected activity and whether there was a causal connection between his protected activity and his termination.  *See* 26 M.R.S. §§ 831-840 (2018).

[¶29]  We review the grant of a motion for summary judgment de novo, viewing the evidence in the light most favorable to the party against whom the summary judgment has been granted in order to determine if there is a genuine issue of material fact.  *Stewart-Dore v. Webber Hosp. Ass'n*, 2011 ME 26, ¶ 8, 13 A.3d 773.  A genuine issue of material fact exists when the factfinder must choose between competing versions of the truth.  *Id*.  When the party moving for summary judgment is the defendant, the burden rests on that party to show that the evidence fails to establish a prima facie case for the claim.  *Cormier v. Genesis Healthcare LLC*, 2015 ME 161, ¶ 7, 129 A.3d 944.

[¶30]  The facts set forth by the parties in their nearly 100 pages of statements of material facts portray different versions of the events taking place between June 2014, when Pushard was hired as director of nursing, and June 2015, when he was suspended from his position.

## I. PROTECTED ACTIVITY

[¶31]  A claim for violation of rights established under the Maine Whistleblowers' Protection Act (WPA), 26 M.R.S. §§ 831-840, consists of three elements: (1) that the employee engaged in activity protected by the WPA, (2) that the employee experienced an adverse employment action, and (3) that there was a causal connection between the protected activity and the adverse employment action.  *Brady v. Cumberland Cty.*, 2015 ME 143, ¶ 14, 126 A.3d 1145; *see* 26 M.R.S. § 833(1).  The Court focuses on the first element—whether the employee was involved in protected activity.  The Court places great emphasis on Riverview's assertion that the complaints that Pushard made about the staffing levels at Riverview were well known and that therefore Pushard's complaints cannot be determined to be "protected activity" within the meaning of the WPA.  *See Cormier*, 2015 ME 161, ¶ 10, 129 A.3d 944.

A.    Complaints Regarding Staffing

[¶32]  In his response to Riverview's statements of material facts, Pushard asserts that he repeatedly complained that the continuation of the

16

staffing approach by administrator Harper and others in management endangered both patient and employee health and safety.[6]

[¶33] Pushard told Harper that he was concerned that nurses were being placed in administrative roles instead of on the floor. Specifically, Pushard complained that removing Nurses Orange and Cote from the patient floor was endangering both patient and employee health and safety in already-dangerous work situations. He complained that the replacement of two full-time nurse educators with part-time nurse educators decreased the availability of nurses on the patient floors. Pushard also argued for the hiring of more mental health workers rather than acuity specialists, because there was no provision for acuity specialists rather than mental health workers under the consent decree that governs Riverview's operations. He continued to report and argue for more mental health workers because there was a ratio of nurses and mental health workers that needed to be maintained under the consent decree.

---

[6] In Pushard's response to Paragraph 16 of Riverview's statement of material facts ("In his conversations with Harper and others at Riverview about staffing issues, Pushard did not believe that he was making Harper or anyone else aware of anything they were not already aware of."), Pushard stated that he was more outspoken than other employees and "particularly stressed that the continuation of the staffing approach by Harper and others in management endangered both patient and employee health and safety."

[¶34]  In *Cormier*, we addressed whether complaints about understaffing at healthcare facilities may be protected by the WPA:

> Although this provision is not triggered by every complaint that relates to safety, it protects employees who, in good faith, make safety-related complaints when the employee reasonably believes that a dangerous condition or practice exists.  A complaint is made in good faith if the employee's motivation is to stop a dangerous condition.  A complaint is supported by reasonable cause when the employee has a subjective and objectively reasonable belief that a dangerous condition or practice exists.

2015 ME 161, ¶ 11, 129 A.3d 944 (citation omitted)(quotation marks omitted).

[¶35]  The Court states that "Pushard's staffing complaints were not whistleblower protected activity because he was not exposing a concealed or unknown safety issue.  Instead, he was simply giving his opinion concerning . . . well-known problems related to staffing," Court's Opinion ¶ 19, and that "Pushard was not *reporting*; he was complaining."  Court's Opinion ¶ 21.  I disagree.

[¶36]  First, complaints concerning safety may be protected activity, and the complaints do not need to be in the form of a report in order for them to be protected.  We made it very clear in *Cormier* that *complaints* about safety issues may constitute protected activity.  *Cormier*, 2015 ME 161, ¶¶ 10-16, 129 A.3d 944; *see also* 26 M.R.S. § 833(1)(B).  Second, that the conditions about which

18

Pushard complained were publicly known does not preclude Pushard from convincing a jury that his complaints are protected by the WPA.

[¶37]  The proposition that complaints about publicly known safety issues can never be protected activity has been expressly overruled by Congress.  5 U.S.C.S § 2302(f)(1)(B) (LEXIS through Pub. L. No. 116-91) ("A disclosure shall not be excluded from subsection (b)(8) [listing WPA protected activities] because . . . the disclosure revealed information that had been previously disclosed."); *see also Hartzman v. Wells Fargo & Co.*, 1:14CV808, 2016 U.S. Dist. LEXIS 18733 at *25-26 (M.D.N.C. Feb. 17, 2016).  In *Hartzman*, the court refuted the defendant's contention that the plaintiff's activity was not protected because the plaintiff raised public information.  The court noted that Congress had clearly expressed its intent to the contrary:

> Further, several of those cases have since been in effect overruled by Congress. For example, *Meuwissen v. Department of Interior*, 234 F.3d 9 (Fed. Cir. 2000), held that a public employee was not protected under the Whistleblower Protection Act of 1989 ("WPA") when disclosing information that was already publicly known. After this holding, Congress expressly overruled this case and amended the statute to specifically include disclosures of already public information.

*Hartzman*, 1:14CV808, 2016 U.S. Dist. LEXIS 18733 at \*25-26 (citation omitted).[7]  The WPA protects Pushard's complaints regarding staffing and safety, whether the alleged understaffing was publicly known or not.

[¶38]  Furthermore, the content of Pushard's complaints was not necessarily publicly known.  The public may have known that Riverview was operating under a consent decree, and that there were staffing issues, but the public may not have necessarily known that Riverview was not complying with the consent decree, and thereby was creating safety issues for patients and staff.

[¶39]  The Court fails to take into consideration that Riverview was operating pursuant to a consent decree with the State regarding management and staffing.  Pushard's complaints regarding understaffing and patient safety take on special significance because of the existence of the consent decree.  Even though Riverview was under close scrutiny by the courts because of staffing issues, it does not follow that Riverview's failure to comply with the consent decree was publicly known and that noncompliance created safety

---

[7] *See* Whistleblower Protection Enhancement Act of 2012, Pub. L. No. 112-199, § 101(b)(2)(C) (2012)(codified at 5 U.S.C.S § 2302(f)(1)(B) (LEXIS through Pub. L. No. 116-91)).  The Maine Whistleblowers' Protection Act is comparable to its federal counterpart, 5 U.S.C. § 2302. *Me. Human Rights Comm'n v. Me. Dep't of Veterans' Servs.*, 627 A.2d 1005, 1007 (Me. 1993).

issues for staff and patients. The issue is not whether Riverview in fact was violating the consent decree and creating safety issues for patients and staff; the issue is whether Pushard had a good faith belief of said safety issues and complained about them to the administration.

[¶40] Pushard's version of the facts paints a completely different picture than the version accepted as fact by the Court. It is up to a jury to decide whether Pushard's complaints constituted protected activity. *See, e.g., Cormier*, 2015 ME 161, ¶¶ 9, 16, 129 A.3d 944 (stating that whether a complaint rises to the level of a protected activity is a question of fact for the jury to resolve).

B.      Complaints Regarding Treatment of Cutler

[¶41] In addition to Pushard's direct complaints of understaffing and related safety concerns made to the administrator, Harper, he also complained about the mistreatment of his assistant director of nursing, Colleen Cutler, after she complained about the same staffing problems. Pushard told Harper that he believed that Harper's mistreatment of Cutler was in retaliation for her complaints about staffing problems. Pushard complained to Harper that he thought Harper had taken away Cutler's office in retaliation for Cutler's complaints about Harper's staffing practices. When Pushard moved Cutler into his office, Harper told Pushard that he disapproved of the move. The complaint

regarding the mistreatment of his assistant who joined him in his complaints is part and parcel of Pushard's complaints about the staffing levels at Riverview. The action taken by the administration against Cutler must be considered along with her relationship to Pushard; the content of her complaints, which were the same as Pushard's complaints; and the administration's displeasure with Pushard's attempt to support his assistant.

[¶42]   On these facts, a jury could find that Pushard was involved in protected activity. *See Cormier*, 2015 ME 161, ¶¶ 9, 16, 129 A.3d 944. A jury could easily infer that Pushard was engaged in protected activity because his complaints were related to patient and employee safety and the complaints involved Riverview's failure to comply with the consent decree. Pushard has raised issues surrounding the question of protected activity that should be submitted to a jury.

C.   Reported HIPAA Violation

[¶43]  The Court decided that there was no causal connection between Pushard's reporting of a possible HIPAA violation and his termination. Court's Opinion ¶ 27. For purposes of this issue the Court assumed that the activity was protected activity. The Court held that Pushard "must rely solely on the temporal proximity between his report of a HIPAA violation and his

22

termination to establish causation." Court's Opinion ¶ 27. The Court never definitively decided that the reporting of the HIPAA violation was protected activity.

[¶44] However, this issue surrounding the reporting of a HIPAA violation cannot be considered in isolation—it must be considered in the context of all that was going on during the 12 months that Pushard was director of nursing before his suspension and ultimate termination. More importantly, Pushard's reporting of the HIPAA violation, combined with his complaints regarding the staffing levels and his complaints about the retaliatory treatment of his assistant who was also complaining about the staffing levels, are all facts upon which a jury could find that he was involved in protected activity.

## II. CAUSATION

[¶45] The trial court and the Court on appeal did not address the causation issue except as it applies to the reporting of the HIPAA violation. Court's Opinion ¶¶ 26-27. The administrative actions taken against Pushard raise disputes of fact related to the causal connection between Pushard's protected activity and his suspension and termination.

[¶46] "Temporal proximity of an employer's awareness of protected activity and the alleged retaliatory action may serve as the causal link for

purposes of a prima facie case." *Daniels v. Narraguagus Bay Health Care Facility*, 2012 ME 80, ¶ 21, 45 A.3d 722; *see also Noviello v. City of Boston*, 398 F.3d 76, 86 (1st Cir. 2005) (applying both federal and state employment discrimination law and reasoning that an adverse condition of employment that "follows hard on the heels of protected activity . . . often is strongly suggestive of retaliation"); *Oliver v. Dig. Equip. Corp.*, 846 F.2d 103, 110 (1st Cir. 1988) (interpreting federal employment discrimination law and stating that evidence that adverse employment action occurred "soon after" the employee's known protected activity is circumstantial proof of a causal connection "because it is strongly suggestive of retaliation.").

[¶47]   We have previously held that temporal proximity between protected activity and an adverse employment decision may be sufficient for a WPA claim to survive a motion for summary judgment. *See Currie v. Indus. Sec., Inc.*, 2007 ME 12, ¶ 28, 915 A.2d 400 (holding that temporal proximity between protected activity and termination would be sufficient to infer causation where the protected activity and the termination occurred within one month of one another); *see also Brady*, 2015 ME 143, ¶ 23, 126 A.3d 1145 ("[T]he *lack* of temporal proximity, although potentially persuasive, is not dispositive, and in

the context of a summary judgment motion it does not compromise a plaintiff's prima facie case.").

[¶48]   Temporal proximity, however, is not the only circumstantial evidence of causation that Pushard has asserted in his statement of material facts.  He also alleges that he was subject to poor treatment by Harper, a pattern that built in intensity and culminated in his suspension and termination.  In the context of WPA claims, where causation must often be proved by way of circumstantial evidence and inference, these are the type of facts that may form the basis of a prima facie case.  *See Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 828 (1st Cir. 1991) ("There are many sources of circumstantial evidence that, theoretically, can demonstrate retaliation in a way sufficient to leap the summary judgment or directed verdict hurdles.  These include, but are not limited to, evidence of differential treatment in the workplace."); *see also Osher v. Univ. of Me. Sys.*, 703 F. Supp. 2d 51, 68 (D. Me. 2010) ("Changes in an employer's treatment of its employee after the protected conduct can reveal a causal connection.").

[¶49]   Pushard was hired as director of nursing in June 2014.  His repeated complaints to Harper began shortly thereafter.  The first sign of the administration's attitude toward Pushard surfaced in November 2014, when

Pushard's assistant director's office was taken away from her without any explanation. In February 2015, Pushard was removed from decision-making regarding the hiring of nurses. To the displeasure of Harper, Pushard allowed his assistant director to share his office beginning in March 2015. He was placed on leave in June 2015, approximately one year after his hiring, and his employment was terminated in October 2015. Pushard asserts that the administration's purported reason for the termination—failure to report Nurse A—was pretextual. Harper directed the human resources department at Riverview to launch an investigation of Pushard.

[¶50] Pushard has asserted sufficient facts from which a jury could find that Harper's purported reason for terminating Pushard was mere pretext. *See Trott v. H.D. Goodall Hosp.*, 2013 ME 33, ¶ 20, 66 A.3d 7 ("[W]hen judges evaluate a summary judgment record, they should be mindful that what might initially appear to be a weak case of pretext is not the same as no case."); *see also Stanley v. Hancock Cty. Comm'rs,* 2004 ME 157, ¶¶ 20-21, 864 A.2d 169 (stating that a defendant is entitled to rely on circumstantial evidence of pretext in making out a prima facie case for a WPA claim).

[¶51] There are many facts presented in the statements of material facts that support Pushard's assertion that the stated reason for his termination was

pretextual. Pushard asserts that he took all reasonable steps to monitor the activity of Nurse A, and in the end the claims against Nurse A—the nurse he allegedly failed to supervise, monitor and report to the administration—were only partially substantiated.

## III. CONCLUSION

[¶52] In his statement of material facts, Pushard presents many facts from which a jury could infer that his termination resulted from his repeated complaints about staffing and safety issues related to the consent decree and his reporting of a possible HIPAA violation. Because Pushard has presented facts that, if true, would establish a prima facie case that he engaged in protected activity and that he was terminated because of that activity, we should not decide these issues as matters of law. In deciding a motion for summary judgment, all reasonable inferences must be given to the moving party, and when reasonable inferences raise issues of material fact, the issues must be decided by a jury.

[¶53] I would vacate the trial court's entry of summary judgment in favor of Riverview and remand for a jury trial.

Arthur J. Greif, Esq. (orally), Gilbert & Greif, P.A., Bangor, for appellant Roland Pushard III

Aaron M. Frey, Attorney General, and Valerie A. Wright, Asst. Att. Gen. (orally), Office of the Attorney General, Augusta, for appellee Riverview Psychiatric Center

Kennebec County Superior Court docket number CR-2017-134
For Clerk Reference Only